**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| MARY WEBB, JOSEPH BERKOSKI, and STACY PLUEBELL, individually and on behalf of a class of similarly situated individuals, | ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:11-cv-04141 |
| v. | ) ) | Hon. Joan H. Lefkow |
| CLEVERBRIDGE, INC., a Delaware corporation, and CLEVERBRIDGE AG, a German company, and UNIBLUE SYSTEMS, LTD., a Maltese company, | ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**PLAINTIFFS' MOTION FOR AND MEMORANDUM IN SUPPORT OF FINAL
APPROVAL OF CLASS ACTION SETTLEMENT AND PETITION FOR APPROVAL
OF ATTORNEYS' FEES AND PLAINTIFFS' INCENTIVE AWARD**

# TABLE OF CONTENTS

I.     **INTRODUCTION** ..................................................................................................1

II.    **FACTUAL AND PROCEDURAL BACKGROUND**.......................................4

      A.     **Plaintiffs' Allegations Regarding Defendants Use of "Scareware"** .................4

      B.     **Class Counsel's Investigation And Expert Report Analyzing the Defendants' Software** ........................................................................................5

      C.     **Removal from the Circuit Court of Cook County and Litigation in the Northern District of Illinois** ..................................................................................6

      D.     **Settlement Discussions with the cleverbridge Defendants**...............................7

      E.     **Preliminary Approval of the Initial Settlement Agreement and Settlement Discussions with Uniblue** ................................................................8

III.   **NOTICE WAS PROVIDED AND DUE PROCESS SATISFIED** ...............9

IV.   **THE SETTLEMENT WARRANTS FINAL APPROVAL** .........................11

      1.     *The Strength of the Plaintiffs' Case Compared to the Settlement Militates in Favor of Granting Approval* ........................................................12

      2.     *The Likelihood of an Increase in the Complexity, Length, and Expense of Continued Litigation Validates the Approval of the Settlement* ....................14

      3.     *There Has Been Almost No Opposition to the Settlement* .................................16

      4.     *The Opinion of Competent Counsel Favors Approval*.......................................17

      5.     *Based on the Stage of Litigation and the Amount of Information Provided, Class Counsel had Sufficient Information to Evaluate the Merits and Reasonableness of the Agreement*....................................................18

V.    **THE ATTORNEYS' FEE AND EXPENSES SHOULD BE APPROVED**...............19

      1.     *The Negotiated Attorneys' Fee Award is Reasonable Under and Should be Calculated Using the Percentage-of-the-Fund Method*.....................................19

            a.     The Negotiated Fee Award in this Case Represents 21.8% of the Common Benefit to the Class—a Percentage Well Below Market and the Range Typically Awarded as Reasonable....................................22

**2.** ***Class Counsel's Lodestar Confirms the Reasonableness of a $1,200,000.00 Award*** ............................................................................................23

**VI.** <u>**THE INCENTIVE AWARDS ARE REASONABLE AND SHOULD BE APPROVED**</u> ................................................................................................26

**VII.** <u>**THE POWERS AND WAITE OBJECTIONS ARE UNSUBSTANTIATED AND SHOULD BE OVERRULED**</u> ..................................................................27

**1.** ***Mr. Waites' Objection Should be Overruled*** ......................................27

**2.** ***Mr. Powers' Objection Should be Overruled*** ....................................29

**VII.** <u>**CONCLUSION**</u> ........................................................................................30

# TABLE OF AUTHORITIES

**United States Supreme Court Cases:**

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) ........................................................20

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) .....................................................9

*Hensley v. Eckerhart*, 461 U.S. 424 (1983)...............................................................23

*Missouri v. Jenkins*, 491 U.S. 274 (1989) .................................................................21

**United States Circuit Court of Appeals Cases:**

*Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305 (7th Cir.1980) ....................18

*Churchill Village, L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) .......................................16

*Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998)....................................................23, 26

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) .......................................................29

*Denius v. Dunlap*, 330 F.3d 919 (7th Cir. 2003) .......................................................23

*Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998) .......................................................18

*Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560 (7th Cir. 1994)...................................20

*Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998) ...................................................21, 22

*Gastineau v. Wright*, 592 F.3d 747 (7th Cir. 2010)....................................................23

*Harman v. Lyphomed, Inc.*, 945 F.2d 969 (7th Cir. 1991) .........................................23

*In re Pac. Enters. Sec. Litig.*, 47 F.3d 373 (9th Cir. 1995)...........................................28

*In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001) .......................20, 21, 23, 26

*In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741 (7th Cir. 2011)...........................20

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996) .........................................................11, 18

*Jeffboat, LLC v. Dir., Office of Workers' Comp. Programs*, 553 F.3d 487 (7th Cir. 2009) .........23

*Rodriguez v. West Pub. Corp.*, 563 F.3d 948 (9th Cir. 2009) .......................................16

*Skelton v. Gen. Motors Corp.*, 860 F.2d 250 (7th Cir. 1988) ........................................ 20

*Sutton v. Bernard*, 504 F.3d 688 (7th Cir. 2007) ................................................. 20, 21

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006) ......................... 12

*Taubenfeld v. AON Corp.*, 415 F.3d 597 (7th Cir. 2005) ................................ 20, 21, 22

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978 (7th Cir. 2002) ......................... 11

*Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399 (7th Cir.1999) ............................................. 25

**United States District Court Cases:**

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 CV 2898, 2012 WL 651727
   (N.D. Ill. Feb. 28, 2012) ........................................................... 11, 12

*Ameritrade Acc't Holder Litig.*, Nos. C 07-2852 SBA, C 07-4903 SBA,
   2011 WL 4079226 (N.D. Cal. 2011) ............................................... 16

*Arenson v. Board of Trade of City of Chicago*, 372 F. Supp. 1349 (N.D. Ill. 1974) ................... 24

*Browning v. Yahoo! Inc.*, No. C04-01463, 2007 WL 4105971
   (N.D. Cal. Nov. 16, 2007) ......................................................... 17, 27

*Cohn v. Nelson*, 375 F. Supp. 2d 844 (E.D. Mo. 2005) ................................................. 24

*Di Giacomo v. Plains All Am. Pipeline*, No. H-99-4137, 2001 WL 34633373
   (S.D. Tex. Dec. 19, 2001) ............................................................ 24

*Domonoske v. Bank of Am., N.A.*, 790 F.Supp.2d 466 (W.D. Va. 2011) ..................................... 29

*Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV-08-1365 CW (EMC), 2010 WL 1687832
   (N.D. Cal. Apr. 22, 2010) ........................................................... 17

*Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc., et al.*, No. 04 C 1107,
   slip op. (N.D. Ill. July 24, 2006) ..................................................... 22

*Hernandez v. Talman Home Mortg. Corp.*, No. 85 C 1330, 1986 WL 5205
   (N.D. Ill. Apr. 29, 1986) ............................................................. 27

*Hispanics United of DuPage Cnty.*, 988 F. Supp. 1130 (N.D. Ill. 1997) ................................. 17

*In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109 (D.N.J. 2002) ..................................... 24

*In re AT&T Mobility Wireless Data Servs. Litig.*, 270 F.R.D. 330 (N.D. Ill. 2010) ........... 9, 12, 19

*In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp.2d 935
　　(N.D. Ill. June 2, 2011) ..................................................................................... 12, 14, 18

*In re Cenco, Inc. Sec. Litig.*, 519 F. Supp. 322 (N.D. Ill. 1981) ...................................... 24

*In re Domestic Air Tranp. Antitrust Litig.*, 148 F.R.D. 297 (N.D.Ga.1993) ............................27-28

*In re Linerboard Antitrust Litig.*, No. 98-5055, 2004 WL 1221350 (E.D. Pa. Jun 2, 2004).........24

*In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, (N.D. Ill. 2000) ........................ 14, 22

*In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) ..................... 24

*In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706 (E.D. Pa. 2001)..........................................24

*In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*,
　　364 F. Supp. 2d 980 (D. Minn. Apr. 8, 2005) ...................................................................24

*LaGarde v. Support.com, Inc.*, No. 3:12-cv-00609-JSC (N.D. Cal. Feb. 7, 2012) ........................2

*Ledet v. Ascentive LLC*, No. 2:11-CV-294-PBT (E.D. Pa. Jan. 18, 2011).............................. 1, 11

*Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005) ..................................... 14, 16

*Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358 (S.D.N.Y. 2002) ................................... 24

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004) ................. 28

*O'Brien v. Brain Research Labs, LLC*, No. CIV.A. 12-204, 2012 WL 3242365
　　(D.N.J. Aug. 9, 2012) ......................................................................................................... 29

*Roberts v. Texaco, Inc.*, 979 F. Supp. 185 (S.D.N.Y. 1997) ....................................................... 24

*Ryan v. City of Chicago*, 274 Ill. App. 3d 913 (1995)................................................................. 24

*Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 578 (N.D. Ill. 2011) .............................*passim*

*Spicer v. Chicago Bd. Options Exch., Inc.*, 844 F. Supp. 1226 (N.D. Ill. 1993) ......................... 22

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-4578,
　　2005 WL 1213926 (E.D. Pa. May 19, 2005)..................................................................... 24

*Teamsters Local Union No. 604 v. Inter-Rail Transport, Inc.*, No. 02-cv-1109 DRH,
　　2004 WL 768658 (S.D. Ill. Mar. 19, 2004) ...................................................................... 22

*Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482 (E.D. Cal. 2010) ....................................28

*Vought v. Bank of Am., N.A.*, No. 10-CV-2052, 2012 WL 4754723
    (C.D. Ill. Oct. 4, 2012)..........................................................................................15

*Williams v. Gen. Elec. Capital Auto Lease*, No. 94 C 7410, 1995 WL 765266
    (N.D. Ill. 1995) ..................................................................................................21

**State Court Cases:**

*Drymon, et al. v. Cyberdefender Corp.*, No. 11 CH 16779
    (Cir. Ct. Cook County, Ill. Sept. 13, 2011) ..................................................1-2

**Rules and Statutes:**

28 U.S.C. § 1332(d)(2) .......................................................................................6

Fed. R. Civ. P. 23 ......................................................................................*passim*

**Miscellaneous Authorities:**

*Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and*
    *Plain Language Guide* (2010) ...................................................................9, 11

Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in*
    *Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules*
    (Federal Judicial Center 1996) ......................................................................22

Plaintiffs Mary Webb, Joseph Berkoski, and Stacy Pluebell ("Plaintiffs" or "Class

Representatives") respectfully request that the Court enter an Order (i) granting final approval of

the class action Settlement Agreement between Plaintiffs and Defendants cleverbridge, Inc.,

cleverbridge AG ("the cleverbridge Defendants") and Uniblue Systems, Ltd. ("Uniblue")

(collectively the "Defendants"), (ii) dismissing Plaintiffs' Second Amended Complaint against

Defendants with prejudice and releasing Defendants of any and all Released Claims as provided

in the Settlement Agreement, (iii) awarding Class Counsel reasonable attorneys' fees and costs in

the amount of $1,200,000.00, (iv) awarding a collective incentive payment in the amount of

$3,000.00 to the Class Representatives, and (v) granting such other and further relief as the Court

deems reasonable and just. In support of their motion, Plaintiffs state as follows:

## I.    INTRODUCTION

The Parties' class action Settlement Agreement represents the culmination of a year-long

effort—through contentious litigation, extended settlement discussions, and even preliminary

approval by this Court of another iteration of the Settlement—to reach a global resolution of

Plaintiffs' and the Class's claims challenging the allegedly deceptive design and marketing of

Defendants' so-called utility software products. The Settlement in its current form is in line with

other similar settlements reached in lawsuits against Defendants' industry competitors that have

been preliminary and finally approved by state and federal courts alike—most recently on

November 19, 2012 in the matter captioned *Ledet v. Ascentive LLC*, No. 2:11-CV-294-PBT

(E.D. Pa. January 18, 2011).[1] As with each of those settlements, and given the substantial

---

[1]    The complete list of settlements reached with Defendants' industry competitors includes the
following cases: (i) *Ledet v. Ascentive LLC*, No. 2:11-CV-294-PBT (E.D. Pa. January 18, 2011) (creating
a $ 9.6 million settlement fund from which class members could make a claim for either $10.00 or $18.00
depending on the type of software purchased; prospective relief prohibiting defendant from overstating
the severity of errors and requiring them to disclose specific, agreed-upon language to consumers about
the true nature of the software; settlement finally approved on November 19, 2012); (ii) *Drymon, et al. v.*

monetary and prospective relief provided to the Class, as well as the inherent risks attendant with continued litigation of this nature, it's clear that the Settlement is fair, reasonable, and adequate, satisfies the requirements of Rule 23 and due process, and should be granted final approval by the Court.

The road to the current Settlement was not without its bumps. Despite the Parties' initial efforts, the original settlement approved by the Court would have resolved only Plaintiffs' and the Class's claims against the cleverbridge Defendants (the "Initial Settlement"), as Defendant Uniblue refused to participate in that agreement, and even went so far as to object to it. But, after the Court overruled those objections, the Parties redoubled their efforts and opened negotiations on a potential global class action settlement that would resolve the claims in this case against all Defendants. The result of those several months of arms' length negotiations is the Settlement now before the Court.

On August 23, 2012, the Court granted preliminary approval of the current Settlement, which provides even greater relief to the Class than the Initial Settlement would have. In particular, Defendants have established a non-segregated common Settlement Fund in the amount of $5.5 million (an increase of $1.5 million from the Initial Settlement) from which each Class Member who submits a valid claim is entitled to receive a cash payment of $12.50 (an increase of $4.00 per claim from the Initial Settlement). The cash payments are significant—they

---

*Cyberdefender Corp.*, No. 11 CH 16779 (Cir. Ct. Cook County, Ill. May 6, 2011) (Hon. K. Pantle, presiding) (creating $9.75 million settlement fund from which class members could make a claim for $10.00 for each software product purchase; prospective relief requiring defendant to provide consumers with enhanced disclosures regarding the functionality and methodology of the software products at issue, as well as certain changes to the software itself; settlement finally approved on Sept. 13, 2011); and (iii) *LaGarde v. Support.com, Inc.*, No. 3:12-cv-00609-JSC (N.D. Cal. Feb. 7, 2012) (creating $8.5 million settlement fund from which class members could make a claim for $10.00 for each software product purchased; three free months of the defendant's anti-spyware software; and prospective relief requiring defendant to provide consumers with enhanced disclosures regarding the functionality and methodology of the software products at issue, as well as certain changes to the software itself; settlement awaiting preliminarily approval).

represent more than 40% of the Class Members' actual out-of-pocket costs for purchasing

Defendants' software and support services, and more importantly, equal upwards of 69% of the

reduced value of the software that Plaintiffs sought to recover in this action. The Settlement Fund

will also be used to pay the administrative expenses of the Settlement, the costs of effectuating

the Court-approved Notice Plan, a collective incentive award to the Class Representatives, and

attorneys' fees and expenses to Class Counsel (subject to Court approval). Moreover, the

Settlement provides robust prospective relief that will ensure that the sorts of deceptive design

and marketing practices at issue here don't continue into the future—namely, the cleverbridge

Defendants have agreed to improve their consumer refund, enrollment notification, and

cancellation procedures, and Uniblue agreed to make more detailed disclosures regarding the

functionality and methodologies underlying its software products.

   Finally, in accordance with the Court's Preliminary Approval Order, the Parties and the

Settlement Administrator have successfully implemented the four-part Notice Plan, which

consisted of (i) direct notice to Class Members by email, (ii) direct notice via post card to any

Settlement Class Members' mailing address (to the extent available) whose e-mail notice

"bounced back," (iii) the publication of a Settlement Website (which allowed Class Members to

submit claims online or download Claim Forms, and review all relevant Court documents), and

(iv) CAFA notice to the relevant governmental agencies.[2] (*See* Dkt. No. 100.) Notably, the notice

was successfully delivered to an overwhelming majority of the Settlement Class: more than 92%,

or Class Members—a number that far surpasses the figures in other similar settlements where

notice was found to have satisfied the rigors of Rule 23 and due process. Further highlighting the

---

[2]   It is noteworthy that notice was sent to the Attorneys General of each state, as well as the
Attorney General of the United States, and not a single concern about or objection to the Settlement was
raised. To be clear, this is not to say that the Attorneys General have necessarily blessed the Settlement,
but the complete lack of opposition to the Settlement certainly informs the discussion of its strength.

strength of the Settlement, even despite reaching such a large portion of the Class, there were just two purported objections to the Settlement—which, as explained, lack any basis in fact or law and can be quickly overruled—and only 22 Class Members have requested to be excluded from the Settlement.

In the end, the results achieved for the Settlement Class and the response from them all strongly indicate that the Settlement is fair, reasonable and adequate, and warrants final approval. For these reasons, and as discussed further below, Plaintiffs respectfully request that the Court grant final approval of the Parties' Settlement, dismiss all Released Claims with prejudice, and award the agreed-upon incentive award, attorneys' fees, and costs.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Plaintiffs' Allegations Regarding Defendants Use of "Scareware."

On September 1, 2011, Plaintiffs filed their Second Amended Class Action Complaint (the "Complaint") alleging that Defendants deceptively market and sell computer software— more commonly known as "scareware"—that tricks consumers into believing that their computers suffer from a variety of errors and security threats, while over-promising that the software is capable of fixing such errors and problems, and can otherwise enhance the computers' efficiency and speed. (Dkt. No. 32, Compl. ¶¶ 19-33.)

To demonstrate the software's supposed utility, Defendants offered consumers a "free diagnostic" scan, which purports to detect errors and other problems on a user's computer. (*Id.* ¶ 38.) After running the free scan, the software invariably reports that there are numerous, often "critical," errors and other problems on the computer and represents that it can fix the supposed errors—but only if the consumer registers and pays for the full version of the software. (*Id.* ¶ 39.) Plaintiffs allege that contrary to Defendants' representations, Uniblue's software was not

designed to perform as advertised. (*Id.* ¶ 40.) Rather, Uniblue intentionally designed the software to misrepresent and exaggerate the severity of errors and the overall health of consumers' computers, thereby inducing them to pay for full versions of the software. (*Id.* ¶ 44.) Making matters worse, after purchasing and running the software, consumers are induced to continue using it based upon Defendants' representations about the purported low health and security status of their computers—representations that correspond to the types of problems Defendants' advertising materials represent the software is capable of remedying. (*Id.* ¶¶ 39-41.)

**B.      Class Counsel's Investigation And Expert Report Analyzing the Defendants' Software.**

Beginning in mid-2010, Class Counsel began a wide-ranging investigation into perceived discrepancies between the advertised and actual functionality of Uniblue's software. (*See* Declaration of Rafey S. Balabanian ¶ 3, attached as **Exhibit 1**.) During the course of that investigation, Class Counsel conducted a long-term study of consumers' experiences with Defendants, which included the examination of hundreds of complaints from Defendants' customers, as well as customer interviews. (*Id.* ¶ 4.)

To assist in the investigation, Class Counsel engaged a computer forensics expert who, over the course of several months, performed a series of independent tests. (*Id.* ¶ 5.) Those tests were completed in a virtually simulated environment to ensure complete control of extraneous variables, and included:

- determining the source of errors detected by Defendants' software;

- verifying whether errors identified by Defendants' software were in fact causing the user's computer to perform poorly;

- viewing timestamps (benchmarks informing the software whether/when to indicate additional errors existed) placed on the user's computer by Defendants' software to evaluate whether errors were artificially inflated;

- installing, uninstalling, and re-installing Defendants' software on a brand new computer system to determine whether false positives were detected; and

- contrasting errors detected pre-registration (i.e., before purchase of Defendants' software) with errors identified post-registration.

(*Id.*)

After reviewing the results of the expert's investigation detailed above and assessing them against Defendants' representations about the software's utility, Class Counsel determined that the expert's findings were consistent with consumer complaints they had received. (*Id.* ¶ 6.)

### C. Removal from the Circuit Court of Cook County and Litigation in the Northern District of Illinois.

Plaintiff Webb filed her initial complaint in this matter against Defendants cleverbridge, Inc. and Uniblue in the Circuit Court of Cook County, Illinois, on May 19, 2011. (Dkt. No. 1.) At that time, Webb also filed her motion for class certification. Soon thereafter, on June 17, 2011, the action was removed by cleverbridge, Inc. to this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").

Fearing a "pick-off" attempt, Webb re-filed her motion for class certification on June 22, 2011. (Dkt. No. 9.) cleverbridge, Inc. then moved to dismiss the complaint for lack of standing under Federal Rule of Civil Procedure 12(b)(1) and, in support of its motion, attached the declaration of its Controller, Aaron Deist. (Dkt. Nos. 12-14.) Rather than immediately oppose cleverbridge, Inc.'s motion, however, Webb moved to strike it, and in the alternative, sought leave to conduct limited discovery on the various jurisdictional issues that cleverbridge, Inc. raised in Deist's declaration. (Dkt. No. 18.) At the July 12, 2011 hearing, the Court granted Webb's motion to strike, denied cleverbridge, Inc.'s motion to dismiss, and allowed Webb to take the deposition of Mr. Deist. (Dkt. No. 21.) That deposition took place on July 29, 2011.

With Mr. Deist's testimony in hand—and after interviewing numerous additional

individuals who complained about Uniblue's software—Webb moved for leave to file a Second Amended Complaint, which sought to add Joseph Berkoski and Stacy Pluebell as party-plaintiffs, as well as to add cleverbridge AG as a party-defendant. The Court granted Webb's motion on September 1, 2011, and Plaintiffs filed their Second Amended Complaint later that day. (Dkt. Nos. 31-32.)

   D.   **Settlement Discussions with the cleverbridge Defendants.**

   Beginning in July 2011, Class Counsel and counsel for the cleverbridge Defendants discussed the potential for resolution of the case as between them. (Balabanian Decl. ¶ 7.) As part of those discussions, Class Counsel and cleverbridge's counsel met at the Chicago offices of SNR Denton, and committed to informally exchange information in hopes of narrowing the factual and legal issues in dispute. (*Id.* ¶ 8.) Uniblue was invited to take part in the discussions, but it declined at that time. (*Id.*)

   On September 16, 2011, following the filing of Plaintiffs' Second Amended Complaint, Class Counsel and counsel for the cleverbridge Defendants met again, at the Chicago offices of Edelson McGuire. (*Id.* ¶ 9.) At the meeting, Class Counsel presented their forensic expert's findings with respect to the software and the cleverbridge Defendants provided their response. (*Id.*) The parties also exchanged their views on various potential settlement structures. (*Id.*)

   Notwithstanding their denial of any wrongdoing, Plaintiffs and the cleverbridge Defendants were eventually able to reach a settlement in principle on class wide relief. (*Id.* ¶ 10.) Negotiations on attorneys' fees and incentive awards did not begin until after a complete agreement was reached on class wide relief. (*Id.*) Those negotiations took place over the course of the next month and it was not until December 30, 2011 that they reached agreement on attorneys' fees and incentive awards. (*Id.*)

Before submitting their settlement agreement to the Court for preliminary approval, Class

Counsel again invited Uniblue to discuss the possibility of a global settlement. (*Id.* ¶ 11.)

Uniblue rejected that invitation, and, on January 6, 2012, filed a Motion to Dismiss for Improper

Venue and Lack of Personal Jurisdiction. (Dkt. No. 60.) That motion was fully briefed by the

Parties and remained pending up until the time the Parties reached in the instant Settlement.

**E.      Preliminary Approval of the Initial Settlement Agreement and Settlement Discussions with Uniblue.**

On March 13, 2012, Plaintiffs filed their Motion for Preliminary Approval of the Initial

Settlement with the cleverbridge Defendants. (Dkt. No. 77.) At the preliminary approval hearing,

Uniblue objected to the proposed class action settlement, arguing, *inter alia*, that approval would

adversely affect their rights to contribution and set off. (Balabanian Decl. ¶ 12.)

On July 12, 2012, after full briefing of Uniblue's objections (Dkt. Nos. 82-85), the Parties

appeared in Court for a second hearing on Plaintiffs' preliminary approval motion. At that

hearing, the Court granted preliminary approval of the Initial Settlement but instructed the

Parties to explore the possibility of a global settlement that would include Uniblue before

sending out the Class Notice. (*Id.*) Further, with respect to Uniblue's pending Motion to Dismiss

for Improper Venue and Lack of Personal Jurisdiction, the Court asked Plaintiffs to submit

supplemental briefing on whether Maltese law allows class actions (as Uniblue asserted Malta as

the proper venue). Plaintiffs submitted their supplemental brief on July 31, 2012. (Dkt. No. 93.)

Immediately following the July 12, 2012 hearing, all Parties re-doubled their efforts to

reach a global settlement agreement, and over the next several weeks, counsel for the Parties

engaged in numerous in-person meetings and conference calls. (Balabanian Decl. ¶ 13.)

Notwithstanding Uniblue's denial of any wrongdoing, and even despite the negotiations breaking

down at several points, the Parties were eventually able to reach a global agreement in principle

that improved and strengthened the relief to the Class Members and included Uniblue. (*Id.* ¶ 14.)

On August 23, 2012, the Court preliminarily approved the Parties' proposed Settlement. (Dkt.

No. 100.)[3]

## III.   NOTICE WAS PROVIDED AND DUE PROCESS SATISFIED

Prior to granting final approval of the Settlement, the Court must consider whether the

notice to the Settlement Class is "the best notice that is practicable under the circumstances,

including individual notice to all members who can be identified through reasonable effort." Fed.

R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *In re*

*AT&T Mobility Wireless Data Servs. Litig.*, 270 F.R.D. 330, 351 (N.D. Ill. 2010). However, the

"best notice practicable" does not require receipt of actual notice by all Class Members in order

to comport with both Rule 23 and the requirements of due process. The Federal Judicial Center

has concluded that a notice plan that reaches at least 70% of the class is reasonable. *Federal*

*Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language*

*Guide* (2010), p. 3.

In this matter, the Court should find comfort in the fact that the notice provided to the

Settlement Class more than satisfied the requirements of due process, this Court's Preliminary

Approval Order, and Rule 23. The Court-approved Notice Plan, which included (i) direct notice

via email to the last known email address of each Settlement Class Member, (ii) direct notice via

post card to any Settlement Class Members' mailing address (to the extent available) whose e-

mail address "bounced back", as well as (iii) uninterrupted access to the Settlement Website, has

been carried out by professional Settlement Administrator Epiq Systems, Inc. (*See* Declaration of

Carlos Rasch ¶¶ 5, 10-12, attached as **Exhibit 3**.)

---

[3]      The terms of the Settlement are set forth in their entirety in the Parties' Settlement Agreement and
Release, attached as Exhibit 2.

Each form of notice provided to the Settlement Class was neutral in tone and provided the Settlement Class Members with a detailed explanation of their rights under the Settlement, including how to obtain the monetary benefits offered by the Settlement, how to "opt-out" of the Settlement, their right to comment in support of or in opposition to the Settlement and how to do so, and how to be heard by the Court. This information gave Class Members the ability to make an informed decision about their participation in the Settlement. Further, direct email[4] and postcard notices directed Class Members to the "long form" notice on the Settlement Website,[5] which provided them with uninterrupted access to the relevant Court documents, downloadable claims forms, and allowed Class Members to submit claim forms online. (*Id.* ¶ 5; *see also* **Exhibits 3-A, 3-B and 3-F**.) Additionally, the Settlement Administrator established and operated a toll-free number whereby Class Members could obtain information about the Settlement, request copies of the notices and Claim Form, and receive assistance with filling out the Claim Form. (*Id.* ¶ 6.)

As anticipated, by taking into account that Defendants required members of the Settlement Class to provide their email addresses when purchasing their products, and by incorporating two methods of direct notice into the Notice Plan, direct notice was delivered to almost the entire Class. Indeed, 1,141,205 of the 1,231,654 Class Members—over 92%—of the Settlement Class were directly notified. (*Id.* ¶ 13.)[6] That figure far surpasses the delivery success rates generally found to be acceptable in consumer class actions, as well as those seen in the other

---

[4]  Direct email notice was initially distributed on September 13, 2012. (Rasch Decl. ¶ 10.)

[5]  The Settlement Website—www.webbclassactionsettlement.com—which went live on September 13, 2012, has remained active since its creation, and will remain active until the close of the claims period on January 7, 2013. (Rasch Decl. ¶ 5.)

[6]  The Claims Administrator originally sent notice to the 1,231,654 e-mail addresses provided by Defendants. Due to reasons such as a Class Member's change or deletion of an email address, however, that initial notice only successfully reached 1,123,659 Class Members. As such, the Claims Administrator subsequently mailed 17,776 direct notices by postcard, only 230 of which were returned as undeliverable. (Rasch Decl. ¶¶ 9-11.)

settlements in this space where similar notice plans were approved as satisfying both Rule 23 and due process considerations. *See, e.g., Ledet*, 2:11-CV-294-PBT (final approval of class action settlement granted where direct e-mail notice reached approximately 70% of the settlement class members); *see also Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010).

As such, the direct notice of the settlement via e-mail and post card (as necessary), combined with the maintenance of the Settlement Website and toll-free telephone line, constitutes the best notice practicable under the circumstances.

## IV.    THE SETTLEMENT WARRANTS FINAL APPROVAL

Federal Rule of Civil Procedure 23(e) mandates that "claims, issues, or defenses of a certified class may be settled . . . only with the court's approval . . . after a hearing and finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e); *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, No. 07 CV 2898, 2012 WL 651727, at *1 (N.D. Ill. Feb. 28, 2012). "Federal courts naturally favor the settlement of class action litigation." *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 578 (N.D. Ill. 2011) (citing *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996)). Given the preference for settlement, the Court's inquiry when determining whether to grant final approval "is limited to [the consideration of] whether the proposed settlement is lawful, fair, reasonable and adequate." *Uhl v. Thoroughbred Tech. & Telecomms., Inc.,* 309 F.3d 978, 986 (7th Cir. 2002).

In analyzing the overall fairness of class settlements, courts typically employ a five-factor analysis, which evaluates "[1] the strength of plaintiffs' case compared to the amount of defendants' settlement offer, [2] an assessment of the likely complexity, length and expense of the litigation, [3] an evaluation of the amount of opposition to settlement among affected parties,

[4] the opinion of competent counsel, and [5] the stage of the proceedings and amount of discovery completed at the time of settlement." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (internal citations omitted); *accord In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 958 (N.D. Ill. June 2, 2011). Each of these factors weighs heavily in favor of granting final approval to the Settlement here.

1. ***The Strength of the Plaintiffs' Case Compared to the Settlement Militates in Favor of Granting Approval.***

In analyzing the Settlement's fairness, the strength of Plaintiffs' case on the merits compared to the amount of the Settlement is "the most important factor" to consider. *Am. Int'l Grp.,* 2012 WL 651727, at *2 (citing *Synfuel* 463 F.3d at 653). The strength of a Plaintiffs' case can be quantified by examining "the net expected value of continued litigation to the class" and then estimating "the range of possible outcomes and ascrib[ing] a probability to each point on the range." *Id.* (quoting *Synfuel,* 463 F.3d at 653). The "Seventh Circuit recognizes that a high degree of precision cannot be expected in these calculations," however, and instead asks courts "to provide a ballpark valuation of the class's claims." *Id.* (internal quotations omitted). Ultimately, "[b]ecause the essence of settlement is compromise courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs." *In re AT&T Mobility*, 270 F.R.D. at 347 (internal quotations omitted).

Here, Class Counsel have conducted a thorough investigation into the facts and legal bases of the claims at issue and, while confident in the strength of those claims, believe that continued litigation posed significant risks to the Plaintiffs' and the Class Members' ability to recover. (Balabanian Decl. ¶ 15.) While Class Counsel believes that the claims based on unfair and deceptive business practices have a high likelihood of succeeding on the merits, the evidence and expert opinions required to substantiate these claims would be highly complex. (*Id.* ¶ 16.)

For example, establishing that Defendants' products do not perform as advertised and were intentionally designed to exaggerate the number and existence of purported errors would require a lengthy, detailed, and ultimately, costly analysis of the technology and algorithms underlying the software—and would most certainly include a vigorous legal challenge by Defendants as to Plaintiffs' ability to obtain that technology for testing in the first instance. (*Id.* ¶¶ 16-17.) Thus, comparing Class Counsel's extensive investigation with the uncertainties attendant with this sort of complex litigation, as well as Defendants' vigorous defense of the allegations against them, supports final approval of the Settlement.

Further, comparing these uncertainties to the relief now available to the Class, the Settlement becomes even more reasonable. Specifically, with only a minimal showing, the Settlement offers each Class Member a cash payment of $12.50. Even if the case were successful at trial, the issue of damages would still remain uncertain. Defendants would argue (and Plaintiff would likely concede) that their software still had some value, even if not the full purchase price they were charging.[7] (Balabanian Decl. ¶ 18.) In recognition of the strength of this argument, Class Counsel estimates that, based on market prices, each Class Member likely would be found to have suffered between $15.00 and $18.00 in damages. (*Id.*) Thus, the $12.50 cash payments secured by the Settlement represent between 69.44% and 83.33% of what Plaintiffs and the Class reasonably could have expected to obtain should they prevail at trial. (*Id.*)

Moreover, in addition to the monetary relief, the cleverbridge Defendants have agreed to enhance their policies related to enrollment, enrollment notification, and cancellation procedures for their negative option-billing program. (Settlement Agreement ¶ VI. A.) Likewise, Uniblue has agreed to provide detailed disclosures to consumers that include the fact that: (i) scans

---

[7]     Indeed, as Plaintiffs did not allege that the software was definitively without utility, Defendants would surely assert this arguably strong defense based on theories of *quantum meruit*, and the Court could have found that a return of the full purchase price would have resulted in an inappropriate windfall.

conducted may detect computer errors that occur as a natural consequence of routine use of the Microsoft Windows Operating System, (ii) in some instances, one or more errors identified in the scan may be harmless and will not damage the health, performance, or operation of the computer system, and (iii) certain computer errors may consistently reappear and thus will be repeatedly detected by the software. Such immediate prospective and monetary relief, coupled with Class Counsel's concerns about the continued viability of each Defendant—specifically, Class Counsel's ability to collect a judgment on foreign entities in Germany and Malta—weighs heavily in favor of settlement. *See In re AT&T,* 789 F. Supp. 2d at 961 ("A dollar recovered today is worth more than a dollar recovered in the future"); *see also Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005) ("[I]t has been held proper to take the bird in hand instead of a prospective flock in the bush.").

Accordingly, weighing the strength of Plaintiffs' claims and the potential risks involved with continued litigation, against the immediate and exceptional results for the Class achieved by the Settlement, strongly supports final approval.

2. ***The Likelihood of an Increase in the Complexity, Length, and Expense of Continued Litigation Validates Final Approval of the Settlement.***

Final approval of a settlement is also favored in cases like this, where "continued litigation would require resolution of complex issues at considerable expense and would absorb many days of trial time." *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1019 (N.D. Ill. 2000). Looking at the benefits of the Settlement, in comparison to the costs of continued litigation, makes clear that settlement was the right course.

Plaintiffs allege that the marketing and design of Defendants' software products were purposefully deceptive and intentionally misleading. As a result, continued litigation would necessarily involve an examination of the following complex issues: (i) whether the software at

issue has the ability to perform as marketed, (ii) whether Defendants' marketing representations were misleading or inaccurate, (iii) whether Defendants purposefully designed their software to deceive consumers into purchasing the products, and (iv) whether Defendants' conduct was knowing and willful.

As evidenced by the hard fought litigation to date, and as Plaintiffs' allegations go to the core of Defendants' business practices and products, there is little doubt Defendants would continue with a vigorous defense. (Balabanian Decl. ¶ 17.) Thus, without the Settlement, the expense, duration and complexity of prolonged litigation would be substantial for all Parties, and the Court. Significant costs would also necessarily be incurred were this matter to proceed to trial, including expenses for expert witnesses, technical consultants, and the myriad other costs necessitated by the trial of a class action. (*Id.*) Further, evidence and witnesses from across the globe would have to be assembled as cleverbridge AG is headquartered in Germany and Uniblue is located in Malta. (*Id.*) And, given the complexity of the factual and legal issues, as well as the amount in controversy, the defeated party would likely appeal. (*Id.*)

Absent this Settlement, Plaintiffs would also inevitably face the risks attendant with certifying and maintaining an adversarial class. *See Vought v. Bank of Am., N.A.*, No. 10-CV-2052, 2012 WL 4754723, at *10 (C.D. Ill. Oct. 4, 2012) ("As a preliminary matter, the hurdle of class certification poses a significant risk because if class certification were denied, the value of each individual plaintiff's case would be reduced to a point such that litigation would be infeasible."). While Plaintiff Webb originally moved for class certification to avoid any pick off attempts by Defendants (Dkt. No. 9), Defendants were not yet required to respond, and the Court has not yet ruled on the motion. As such, absent the instant Settlement, Defendants would undoubtedly oppose Plaintiffs' attempt to certify the Class, and the risk of losing the ability to

negotiate class-wide relief would increase significantly. Accordingly, the relief afforded by the Settlement weighs heavily in favor of its approval, especially compared to the inherent risks, expense and complexity of continued litigation, trial, and appeal.

Thus, the second *Synfuel* factor is satisfied as well.

### 3. *There Has Been Almost No Opposition to the Settlement.*

The Settlement Class consists of some 1,231,654 Class Members, 92% of which (or 1,141,205 Class Members) received direct notice of the Settlement. Out of the more than 1 million individuals in the Settlement Class, there were only two (2) pro se objections[8] to the Settlement—with one objector actually filing a Claim Form despite contending that the relief provided is supposedly insufficient—or fewer than one objection for every 615,827 Class Members, and only 22 op outs.[9] As courts explain, this "infinitesimal" amount of opposition strongly favors approval of the Settlement. *See Lipuma*, 406 F.Supp.2d at 1324 (explaining that 1,159 opt-outs and 41 objections out of approximately nine million notices sent supports approval); *accord Rodriguez v. West Pub. Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) (explaining that "court ha[s] discretion to find a favorable reaction . . . among class members" where there were "only fifty-four submitted objections" out of 376,301 class members receiving notification); *Churchill Village, L.L.C. v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming approval of class action settlement with 45 objections from a 90,000 person class); *In re TD Ameritrade Acc't Holder Litig.*, Nos. C 07-2852 SBA, C 07-4903 SBA, 2011 WL 4079226, at *7 (N.D. Cal. 2011) (finding that reaction of class was "positive" where there were "only 23 [objections] and less than 200 [opt-outs]" out of six million class members receiving

---

[8]     True and accurate copies of the Class Members' requests for exclusion, as well as the Objections of Patrick Powers and Christopher Waite are attached hereto as **Exhibits 3-C and 3-D**, respectively.

[9]     As discussed in Section VII *infra*, neither objection has any basis in fact or law, and can appropriately be overruled by the Court.

notice); *Browing v. Yahoo! Inc.*, No. C04-01463, 2007 WL 4105971, at *12 (N.D. Cal. 2007) (139 objections out of 14 million – or "1 objector for every 100,720 class members" is a "low" rate "even compared to objection rates in similar class action settlements").

Similarly, while Defendants sent notice to each of them pursuant to CAFA, none of the various state and federal officials that were notified of the Settlement raised any objection to or otherwise inquired about it. *See Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV-08-1365 CW (EMC), 2010 WL 1687832, at *14 (N.D. Cal. Apr. 22, 2010) ("Although CAFA does not create an affirmative duty for either the state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures."). Although this lack of opposition is not dispositive, it too lends further support to granting final approval of the Settlement.

Accordingly, the third *Synfuel* factor weighs in favor of final approval here.

### 4. *The Opinion of Competent Counsel Favors Approval.*

The next *Synfuel* factor looks to the opinion of competent counsel as "relevant to the question whether a settlement is fair, reasonable, and adequate under Rule 23." *Schulte*, 805 F. Supp. 2d at 586. This is especially true where Class Counsel are qualified, where discovery and settlement negotiations are extensive and thorough, and where there is no indication of collusion. *Id.*; *see also Hispanics United*, 988 F. Supp. at 1150, n. 6 (noting that a "strong initial presumption of fairness attaches" where the settlement is "the result of arm's length negotiations," and where plaintiff's counsel are "experienced and have engaged in adequate discovery").

Based on their significant experience serving as class counsel in class actions of similar

size, scope and complexity to the instant action—including nearly a dozen cases involving fraudulent software marketed and sold by Defendants' industry competitors—Class Counsel believes that the results achieved for the Settlement Class here are fair, reasonable, and adequate. (Balabanian Decl. ¶ 19; *see also* Edelson McGuire LLC Firm Resume, attached as **Ex. 1-A** to the Balabanian Declaration.) Moreover, discovery and settlement discussions were extensive. The Settlement was not finalized until after the Parties exchanged informal and formal discovery, briefed numerous substantive motions, and participated in several months and two rounds of arm's length negotiations (first, with respect to the Initial Settlement, and later, a more global resolution). (Balabanian Decl. ¶ 23.)

Thus, in the end, faced with the prospect of receiving nothing, and at all times being pitted against highly-experienced defense counsel who promised to mount a formidable defense, Class Counsel are confident that the monetary and prospective relief provided under the Settlement is an exceptional result for the Class and the fourth *Synfuel* factor is satisfied as well. (*Id.* ¶ 19.)

5.  ***Based on the Stage of Litigation and the Amount of Information Provided, Class Counsel had Sufficient Information to Evaluate the Merits and Reasonableness of the Agreement.***

Finally, the fifth factor focuses on the stage of the proceedings and amount of information exchanged to determine "how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims." *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 325 (7th Cir.1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). However, approval of a settlement does not hinge on the amount of formal discovery conducted by the Parties; instead "the pertinent inquiry is what facts and information have been provided." *Schulte*, 805 F.Supp.2d at 587 (quoting *In re AT&T*, 789 F. Supp. 2d at 967); *see also*

*Isby*, 75 F.3d at 1200 (approving a settlement where "discovery and investigation conducted by class counsel prior to entering into settlement negotiations was extensive and thorough.").

Even before this lawsuit was filed, Class Counsel conducted an extensive investigation including engaging its own expert—a leading cyber security researcher—to complete multiple rounds of forensic testing. (Balabanian Decl. ¶ 5.) Further, throughout this litigation, the Parties have continually explored the strengths and weaknesses of their respective claims and defenses through the exchange of both formal and informal discovery, including an in-person deposition, retaining outside counsel in Malta to research Maltese law, and engaging in several (and often contentious) rounds of settlement discussions. (*Id.* ¶ 23.) By doing so, and with the experience and industry knowledge gained through other lawsuits against Defendants' competitors, Class Counsel has an acute understanding of the legal and factual underpinnings of Plaintiffs' and the Class Members' claims. *See In re AT&T Mobility*, 270 F.R.D. at 350 ("The lack of [formal] discovery prior to settlement, however, does not preclude a court from approving a settlement," especially where "counsel have conducted a significant amount of informal discovery and dedicated a significant amount of time and resources to advancing the underlying lawsuits.") (internal citation omitted). It was with that information and experience that Class Counsel was able to negotiate the Settlement now before the Court and determine that it is fair, reasonable, and adequate, and in the best interests of the Class. (*Id.* ¶ 19.)

The final *Synfuel* factor also weighs in favor of finally approving the Settlement.

## V.     THE ATTORNEYS' FEE AND EXPENSES SHOULD BE APPROVED

### 1.     *The Negotiated Attorneys' Fee Award is Reasonable Under and Should be Calculated Using the Percentage-of-the-Fund Method.*

In deciding an appropriate fee in common fund cases such as this, the Seventh Circuit has "consistently directed district courts to 'do their best to award counsel the market price for legal

services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007) (quoting *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*")); *see also Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000) (finding that in common fund cases, "the measure of what is reasonable [as an attorney fee] is what an attorney would receive from a paying client in a similar case"); *In re Trans Union Corp. Privacy Litig.*, MDL 1350, No. 00 C 4279, 2009 WL 4799954, at *9 (N.D. Ill. Dec. 9, 2009) *order modified and remanded*, 629 F.3d 741 (7th Cir. 2011) ("The analysis should be determined from what an arms-length negotiation between the class and the lawyers at the beginning of the case would have likely produced."); *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005) ("Although is it impossible to know *ex post* exactly what terms would have resulted from arm's-length bargaining *ex ante*, courts must do their best to recreate the market by considering factors such as actual fee contracts that were privately negotiated for similar litigation. . . .") (citing *Synthroid I*, 264 F.3d at 719). This rule "is based on the equitable notion that those who have benefited from litigation should share in its costs." *Sutton*, 504 F.3d at 691-92 (citing *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 252 (7th Cir. 1988); *see also Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (class lawyers who secure a fund for the benefit of the class are entitled to payment from the fund to avoid unjustly enriching those who benefit from class counsel's and the class representatives' efforts).

Accordingly, although awarding attorneys' fees based on a percentage of the recovery or Class Counsel's lodestar remains within the discretion of the district court, *In re Trans Union Corp.*, 2009 WL 4799954, at *9 (citing *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 650, 566 (7th Cir. 1994), "[t]he approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred upon the class" especially where the percentage accurately

reflects the market. *Williams v. Gen. Elec. Capital Auto Lease*, No. 94 C 7410, 1995 WL 765266, *9 (N.D. Ill. 1995); *see also Sutton*, 504 F.3d at 693 (directing district court on remand to consult the market for legal services so as to arrive at a reasonable percentage) (citing *Missouri v. Jenkins*, 491 U.S. 274, 285 (1989) (stating that in determining attorneys' fees, "we have consistently looked to the marketplace as our guide to what is 'reasonable'")).

In this case, the contingent nature of the fee arrangements between Class Counsel and Plaintiffs supports application of the common benefit approach. (*See* Balabanian Decl. ¶ 20.) Indeed, fee awards in similar consumer class actions are often awarded as a percentage of the common fund created by the litigation. *See, e.g.*, *Taubenfeld*, 415 F.3d at 600 (affirming district court's award of 30% of the $7,250,000.00 settlement fund); *In re Synthroid Mktg. Litig.*, 325 F.3d at 718 (affirming the district court's award of 30% of the first $10,000,000 to counsel representing the consumer class); *Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998) (affirming district court's award of 38% of a common fund).

Additionally, Class Counsel assumed a substantial risk of non-payment given the complexity of the Action and Defendants' position that they stood ready at all times to vigorously defend the lawsuit. (Balabanian Decl. ¶ 23.) In light of the significant likelihood that Class Counsel (and the Class) could have ultimately recovered nothing, Class Counsel had every incentive to litigate this matter in the most efficient manner possible. Further, the magnitude of the recovery for the Class Members also supports an award based on the common benefit approach. That is, Class Members who submit valid claims are entitled to receive payments— ranging from $12.50 to $18.00—from a $5,500,000 Settlement Fund, a significant recovery for the Class.

a.    The Negotiated Fee Award in this Case Represents 21.8% of the Common Benefit to the Class—a Percentage Well Below Market and the Range Typically Awarded as Reasonable.

The negotiated fee award here ($1,200,000) represents 21.8% of the $5,500,000.00 Settlement Fund, which is well below the norm awarded in similar class litigation in this market. (Balabanian Decl. ¶ 21); *see also Taubenfeld*, 415 F.3d at 599 (awarding 30% of common fund); *Spicer v. Chicago Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1251-52 (N.D. Ill. 1993) (awarding 29% of common fund); *Greater Pa. Carpenters Pension Fund v. Whitehall Jewellers, Inc., et al.*, No. 04 C 1107, slip op. (N.D. Ill. July 24, 2006) (awarding 30% of common fund). Indeed, applying the market percentage method in the Seventh Circuit results in awards of attorney's fees "equal to approximately one-third or more of the recovery." *Teamsters Local Union No. 604 v. Inter-Rail Transport, Inc.*, No. 02-cv-1109 DRH, 2004 WL 768658, at *1 (S.D. Ill. Mar. 19, 2004) ("In this Circuit, a fee award of thirty-three and one-third (33 1/3%) in a class action in [sic] not uncommon"); *see also In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1033 (recognizing "the established 30% benchmark for an award of fees in class actions."); *Spicer*, 844 F. Supp. at 1251-52 (awarding 29% of a common fund); *Gaskill*, 160 F.3d at 362-363 (noting that typical contingency fees are between 33% and 40% and that "[s]ome courts have suggested 25% as a benchmark figure for a contingent-fee award in a class action"). These figures are also in accord with a Federal Judicial Center Study that found that in federal class actions, median attorney fee awards were in the range of 27% to 30%. *See* Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules*, at 69 (Federal Judicial Center 1996).

As such, the 21.8% of the $5,500,000.00 Settlement Fund requested by Class Counsel here,

is reasonable and fair, as it is well within the going market rate. Thus, awarding fees based on a percentage of the Settlement Fund is supported by the Plaintiffs' fee agreements with Class Counsel as well as fee awards in similar class actions.

2.   *Class Counsel's Lodestar Confirms the Reasonableness of a $1,200,000.00 Award.*

While many courts in this Circuit "have criticized the use of a lodestar cross-check in common fund cases," the fee request here is reasonable under that analysis as well. *See Schulte*, 805 F. Supp. 2d at 598;[10] *see also In re Synthroid Mktg. Litig.*, 325 F.3d at 979-980 ("The client cares about the outcome alone" and class counsel's efficiency should not be used to "reduce class counsel's percentage of the fund that their work produced."). To determine the reasonableness of attorneys' fees under the lodestar method, the first step is to "multiply[] a reasonable hourly rate by the number of hours reasonably expended." *Gastineau v. Wright,* 592 F.3d 747, 748 (7th Cir. 2010) (*citing Hensley v. Eckerhart*, 461 U.S. 424, 433-37 (1983)). A reasonable hourly rate should be in line with the prevailing rate in the "community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Jeffboat, LLC v. Director, Office of Workers' Comp. Programs*, 553 F.3d 487, 489 (7th Cir. 2009); *see also Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003) (finding the attorney's actual billing rate for comparable work is presumptively appropriate).

Oftentimes, the base lodestar is adjusted using a multiplier to take into account various factors in the litigation, including "the complexity of the legal issues involved, the degree of success obtained, and the public interest advanced by the litigation." *Gastineau*, 592 F.3d at 748. When applying a multiplier to the base lodestar amount, courts should also consider the risk

---

[10]   In the Seventh Circuit the use of a lodestar cross-check is not required. *Williams*, 658 F.3d at 636; *see also Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998) ("[W]e have never ordered the district judge to ensure that the lodestar result mimics that of the percentage approach.").

plaintiff's counsel assumes in recovering nothing. *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975-76 (7th Cir. 1991) (remanding case for recalculation of attorneys' fees because the trial court failed to award a risk multiplier.) Typical multipliers awarded in comparable class action litigation average around 4, but are often much higher. *In re Linerboard Antitrust Litig.*, No. 98-5055, 2004 WL 1221350, at *14 (E.D. Pa. Jun. 2, 2004) (recognizing that from 2001 to 2003, the average multiplier approved in common fund cases was 4.35).[11]

Given the exceptional result achieved for the Settlement Class in this case, Counsel's base lodestar is not only reasonable, but also justifies the application of a moderate multiplier. As reflected in the chart below, the total adjusted-lodestar[9] of Class Counsel to date is $679,298.27 (Balabanian Decl. ¶ 21.)

---

[11]     *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-4578, 2005 WL 1213926, at *18 (E.D. Pa. May 19, 2005) (approving lodestar multiplier of 15.6); *In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 999 (D. Minn. Apr. 8, 2005) (approving lodestar multiplier of 4.7); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 736, n.44 (E.D. Pa. 2001) (finding fee award equivalent to 4.5 to 8.5 lodestar multiplier "unquestionably reasonable"); *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 197 (S.D.N.Y. 1997) (approving lodestar multiplier of 5.5); *In re AremisSoft Corp. Sec. Litig.*, 210 F.R.D. 109, 135 (D.N.J. 2002) (approving lodestar multiplier of 4.3); *Di Giacomo v. Plains All Am. Pipeline*, No. H-99-4137, 2001 WL 34633373, at *10-11 (S.D. Tex. Dec. 19, 2001) (approving percentage fee that resulted in multiplier of 5.3); *Ryan v. City of Chicago*, 274 Ill. App. 3d 913, 919 (1995) (approving fee award of 33% of common fund, which court stated for comparative purposes only, resulted in a multiplier of 4); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 862 (E.D. Mo. 2005) ("courts typically apply a multiplier of 3 to 5 to compensate counsel for the risk of contingent representation"); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (approving fee equaling a multiplier of 3.97, and noting that "in recent years multipliers of between 3 and 4.5 have become common"); *Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358, 371 (S.D.N.Y. 2002) ("the modest multiplier of 4.65 is fair and reasonable" and "well within the range awarded by courts . . . throughout the country"); *In re Cenco, Inc. Sec. Litig.*, 519 F. Supp. 322, 326-028 (N.D. Ill. 1981) (multiplier of 4.0); *Arenson v. Board of Trade of City of Chicago*, 372 F. Supp. 1349, 1359 (N.D. Ill. 1974) ("award of four times the hourly rate of the plaintiffs' attorneys is meant to adequately compensate them for initiating this significant litigation and negotiating such a beneficial settlement for the class . . . .").
[9]     Class Counsel has reviewed the hours expended by the attorneys and staff at Edelson McGuire and reduced any hours deemed even remotely duplicative or excessive. (Balabanian Decl. ¶ 21.)

| ATTORNEY (POSITION) | RATE | HOURS | TOTAL |
|---|---|---|---|
| Jay Edelson (Managing Partner) | $630 | 116.1 | $73,143.00 |
| Rafey S. Balabanian (Partner) | $500 | 289.5 | $144,750.00 |
| Steven Woodrow (Partner) | $500 | 108.0 | $90,000.00 |
| Ari J. Scharg (Associate) | $365 | 492.1 | $179,616.50 |
| Benjamin H. Richman | $345 | 87.3 | $30,118.50 |
| Eve-Lynn J. Rapp (Associate) | $345 | 53.6 | $18,492.00 |
| Chandler Givens (Associate) | $295 | 413.2 | $121,894.00 |
| Law Clerks | $215 | 75.7 | $16,275.50 |
| **Expenses** | | | **$5,008.77** |
| **TOTAL** | | **1,635.5** | **$679,298.27** |

The attorney and staff rates used to calculate Class Counsel's lodestar figure are comparable to those charged by attorneys with similar experience, skill, and reputation, for similar services in the Chicago legal market and other comparable markets throughout the country, and they have been approved by courts throughout the country. (*Id*. ¶ 22.) Additionally, the hourly rates used to calculate Counsel's base lodestar are the same as those charged to their hourly-paying clients. (*Id*.); *see, e.g., Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 407 (7th Cir.1999) (where the base lodestar is reflective of the rates charged to hourly-paying clients, there is a presumption of reasonableness).

Even before considering the expenses Class Counsel expended prosecuting these matters,[10] it's apparent that a multiplier of 1.77 to Counsel's base lodestar is warranted. *See Schulte*, 805 F. Supp. 2d at 598 ("a multiplier of less than 2.5 [] is not an unreasonable risk multiplier."). The risk of recovering nothing was significant given the complex nature of the claims at issue and Defendants' ability and willingness to vigorously defend the actions—potentially in foreign forums.

---

[10]     In addition to the requested attorneys' fees, Class Counsel have expended $5,008.77 in reimbursable expenses, including filing and appearance fees, case administration expenses, and the additional expenses required to see this matter through final approval. (Balabanian Decl. ¶ 17.)

Thus, there was a commensurately higher risk of an adverse ruling being entered. Indeed, as explained above, Defendants' efforts to defend the case required Class Counsel to research, brief and argue numerous substantive motions, all in addition to the significant pre-suit investigation, discovery, extensive settlement discussions and briefing on the settlements now (and previously) before the Court. (Balabanian Decl. ¶¶ 23.)

With that in mind and considering that the rates employed by Class Counsel are their normal billing rates, they likely would not have agreed to prosecute these matters absent the prospect of a multiplier. (Balabanian Decl. ¶¶ 23-24.) Accordingly, Counsel's base lodestar of $679,298.27 warrants a multiplier of 1.77, which is both reasonable and within the range of attorneys' fees commonly awarded in similar cases.

## VI.    THE INCENTIVE AWARDS ARE REASONABLE AND SHOULD BE APPROVED

The negotiated incentive award to the Class Representatives warrant approval as well. Because a plaintiff is an "essential ingredient of any class action," incentive awards are often necessary to encourage or induce individuals to participate in these cases. *Cook*, 142 F.3d at 1016; *see In re Synthroid Mktg. Litig.*, 264 F.3d at 722-23 ("incentive awards are justified when necessary to induce individuals to become named representatives."). In deciding whether an incentive award is warranted, courts look to: (1) "the actions the plaintiff has taken to protect the interests of the class"; (2) "the degree to which the class has benefitted from those actions"; and (3) "the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook*, 142 F.3d at 1016. Each of these factors is readily satisfied in this case.

Absent the Class Representatives' efforts and contributions to the litigation, it is unlikely that any relief would have become available to the Class. (Balabanian Decl. ¶ 24.) Specifically, the Class Representatives (i) communicated at length with Class Counsel regarding the factual

development of the case and their personal experiences with Defendants, (ii) reviewed documents filed and exchanged by the Parties, including the Complaint, settlement agreements, and other documents, and likewise were consulted on the accuracy of the statements made in these documents and the veracity of the claims at issue, and (iii) prepared informal written discovery responses. (*Id*.) Thus, the agreed-upon collective incentive award of $3,000.00 is reasonable and should be approved.

## VII.    THE POWERS AND WAITE OBJECTIONS ARE UNSUBSTANTIATED AND SHOULD BE OVERRULED

Finally, and as noted above, despite that direct notice was provided to 1,141,205 Class Members, only two—Patrick A. Powers and Christopher A. Waite (collectively, the "Objectors")[12]—have filed formal objections with the Court. The Objections are made on two primary bases: (i) that Mr. Waite believes individual Class Members should receive larger payments, and (ii) Mr. Powers believes that Class Counsel's negotiated fee award and the incentive award to the Class Representatives are excessive. As explained below, each of those objections fails and should be summarily overruled.

### 1.    *Mr. Waite's Objection Should be Overruled.*

First, although agreeing with Plaintiffs' assessment of the software products at issue and actually having submitted a claim for relief under the Settlement, Mr. Waite contends (without much explanation) that an "increase [in] the settlement amount" is warranted. As an initial matter, "simply argu[ing] that the amount awarded to Class Members should be increased [] is 'tantamount to complaining that the settlement should be better, which is not a valid objection.'" *Schulte*, 805 F.Supp.2d at 595 (quoting *Browning*, 2007 WL 4105971, at *5; *see also Hernandez v. Talman Home Mortg. Corp.*, No. 85 C 1330, 1986 WL 5205, at *2 (N.D. Ill. Apr. 29, 1986)

---

[12]    Mr. Powers and Mr. Waite both sent in their objections via regular mail to the Claims Administrator on September 13 and September 17, 2012, respectively. (*See* Exs. 3-C and 3-D.)

("a settlement is, by its very nature, a compromise" and "[s]ettlement for less than the full amount claimed is routine."); *see also Shulte*, 805 F.Supp.2d at 584 (explaining that "there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.") (citing *In re Domestic Air Tranp. Antitrust Litig.*, 148 F.R.D. 297, 325 (N.D.Ga.1993)). Indeed, Waite's objection is essentially nothing more than a disagreement with Class Counsel about the value of the case, and such a disagreement is insufficient to prevent approval. *See, e.g. Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) (quoting *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) ("Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation."). Instead, the Court's focus should be on whether the settlement is the product of adversarial negotiation as opposed to fraud or collusion. *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 490 (E.D. Cal. 2010) (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977) ("[T]he trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel.").

Further, Mr. Waite's objection ignores the fact that Plaintiffs' theory of this case has never been that the software at issue lacked any utility whatsoever, but rather, was of a diminished value based on certain inabilities to perform as advertised. Thus, as explained above, the $12.50 cash payments available to Class Members represents more than 40% of the total purchase price of the software ($29.99) and upwards of 69% of the amounts Class Members overpaid for it. (Balabanian Decl. ¶ 18.) Likewise, that analysis and the relief provided here is consistent with the relief provided under the other settlements in this space that have previously been approved by courts throughout the country. (*See, supra*, fn. 1.) Of course, if Mr. Waite was

dissatisfied with the Settlement, he could have simply opted-out and attempted to obtain the relief he believes appropriate. Nevertheless, he did not—and actually filed a claim instead—and thus, should not now be permitted to thwart the other Class Members' ability to do so.  Mr. Waite's objection should be overruled.

### 2. *Mr. Powers' Objection Should be Overruled.*

Mr. Powers' objection seems to be based upon a fundamental distrust of the class action mechanism and American legal system in general. (*See* Exhibit 3-D). His objection consists of five sentences that, with respect, are not entirely intelligible, except that he says the case "is all about greed and a broken system. . . ." (*Id*.) The rest of the objection, which takes up less than half a page, appears to be reciting Plaintiffs' preliminary approval papers. And while he doesn't actually say it, Mr. Powers highlights (by circling) the reference to the requested attorneys' fees, as if to say that he takes issue with them. Mr. Powers doesn't provide any analysis of the Settlement or its perceived shortcomings. Powers' objection is considered a "philosophical" objection to the class action mechanism, which is inevitable in large class actions and doesn't "impugn the adequacy of the settlement itself." *See Domonoske v. Bank of Am., N.A.*, 790 F.Supp.2d 466, 474 (W.D. Va. 2011) (in class of 3 million, "most of the 59 objections show a philosophical disagreement with class action litigation, a general disagreement with this litigation in particular, or dissatisfaction with class counsel's requested attorney's fees"); *accord O'Brien v. Brain Research Labs, LLC*, CIV.A. 12-204, 2012 WL 3242365 at *25 (D.N.J. Aug. 9, 2012) (discounting statement which "embodies the objector's personal views about class action litigation generally [specifically that the "only group that makes a large profit are the lawyers representing the plaintiff groups"] and is not addressed to the specifics of this settlement").[13]

---

[13]     Mr. Powers also remarks in passing that he has "no ideas [sic] what products that [the Settlement] might apply to." (Ex. 3-D.) To the extent that statement can be considered an objection, it too should be

For these reasons, Mr. Powers' objection should be overruled as well.

## VIII.  CONCLUSION

For the foregoing reasons, Plaintiffs Mary Webb, Joseph Berkoski, and Stacy Pluebell respectfully request that the Court enter an Order (i) granting final approval of the Class Action Settlement Agreement between Plaintiffs and Defendants cleverbridge, Inc., cleverbridge AG and Uniblue Systems, Ltd., (ii) dismissing Plaintiffs' Second Amended Complaint against Defendants with prejudice and releasing Defendants of any and all liability as provided in the Settlement Agreement, (iii) awarding Class Counsel reasonable attorneys' fees and costs in the amount of $1,200,000.00, (iv) awarding a collective incentive payments in the amount of $3,000.00 to the Class Representatives, and (v) granting such other and further relief as the Court deems reasonable and just.[14]

Respectfully submitted,

Dated:  November 29, 2012

**MARY WEBB, JOSHEPH BERKOSKI, AND STACY PLUBELL,** individually and on behalf of all others similarly situated

By: /s/ Rafey S. Balabanian
One of Plaintiffs' Attorneys

---

overruled. The Settlement Agreement, which was submitted to the Court and has at all times been accessible from the Settlement Website, clearly sets forth which individuals are entitled to relief and which of Defendants' products the Settlement Agreement applies. Specifically, the Agreement states that Class Members are eligible to recover a Settlement Benefit if they purchased "(a) any software or services designed by Uniblue or offered under the Uniblue name or brand (and any updates and upgrades thereto), that has been sold or licensed by cleverbridge, and (b) any product or service offered and/or charged to customers in conjunction with the foregoing, including, without limitation, Active Protection and other subscription services." (*Id.* § II.) As such, there can be no real confusion as to which of Defendants' products the Settlement Agreement applies.

[14]     A [Proposed] Final Approval Order is attached hereto as **Exhibit 4**.

Jay Edelson, Esq.
Rafey S. Balabanian, Esq.
Ari J. Scharg, Esq.
Chandler R. Givens, Esq.
Edelson McGuire, LLC
350 North LaSalle, Suite 1300
Chicago, IL 60654
Telephone: 312.589.6370
Facsimile: 312.913.9401
jedelson@edelson.com
rbalabanian@edelson.com
ascharg@edelson.com
cgivens@edelson.com

## CERTIFICATE OF SERVICE

I, Rafey S. Balabanian, an attorney, certify that, on November 29, 2012, I served the above and foregoing *Motion for and **Memorandum in Support of Final Approval of Class Action Settlement and Petition for Approval of Attorneys' Fees and Plaintiff's Incentive Award***, by causing true and accurate copies of such papers to be filed and transmitted to all counsel of record via the Court's CM/ECF electronic filing system, on this the 29th day of November, 2012.

/s/ Rafey S. Balabanian